[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
After hearing the evidence of the witnesses and the arguments of counsel, reviewing the record of this case and the criminal history of defendant, and hearing the elocution of the defendant, the court finds by a preponderance of evidence that the defendant is in violation of his probation and that the sentence of probation should be revoked and sentence imposed of three years to serve. The transcript of the court's ruling on the violation of probation and sentencing is annexed hereto and filed as the findings of this court, specifically pages 16 to 27.
 So ordered. Sequino, J.
 ATTACHMENT
THE COURT: Are we ready to proceed?
MR. SIBLEY: Yes, Your Honor.
THE COURT: I believe you had a witness to call; go ahead.
Okay, identify yourselves again for the record, please.
MR. SIBLEY: Attorney Brian Sibley from the state's attorney's office.
MR. RICHARDS: And Mike Richards.
MR. RICHARDS: May I call up the witness, please?
THE COURT: Call the witness by name.
MR. RICHARDS: Thank you. Erin O'Connor.
ERIN O'CONNOR, CT Page 13700-b
Called as a witness, having first been duly sworn, was examined and testified on her oath as follows:
DIRECT EXAMINATION BY MR. RICHARDS:
Q Ms. O'Connor, where are you staying now?
A York Correctional Institution.
Q And why is that?
A Because someone said that we — I robbed him.
Q All right.
MR. RICHARDS: I'm sorry, I can't hear. It's not so much her —
THE COURT: You can move over if you want or she can move closer. I —
MR. RICHARDS: We have to keep further with the microphone.
(The proceedings were interrupted.)
THE COURT: She just needs to keep her voice up, all right? And repeat the —
THE WITNESS: I can be loud.
MR. RICHARDS: I can hear that just fine.
THE COURT: Okay. We won't be offended.
THE WITNESS: I can sure be loud.
THE COURT: Well, just be politely loud. He didn't hear your answer.
BY THE WITNESS:
A Someone had said that I — we robbed him, myself and Fred.
Q Okay. Ma'am, how long have you been incarcerated now?
A Five months. CT Page 13700-c
Q All right. Is that roughly May?
A Beginning of June.
Q Beginning of June.
A Yes.
Q Can you tell me about the events of the allegations? You were in May you were arrested?
A What happened?
Q With Mr. Schofield.
A Yeah, all right. Well, I am a prostitute and this gentleman wanted some favors and I wasn't willing to do what he wanted me to do for him for the price he wanted to pay.
Q Can we back this up? Where did you meet Mr. Schofield?
A At Spunky's.
Q All right. About what time?
A About six, six-thirty in the morning.
Q A.m., right?
A Yeah.
Q All right. You may continue. What happened after that?
A He wanted some sexual favors and I was not willing to do what he wanted me to do for the price he was willing to pay me. So I told him —
Q Let me stop you there. Let's get back to Spunky's. What, did you approach him or did he approach you?
A I approached him.
Q Why? CT Page 13700-d
A Because I saw that he had some money.
Q How did you see that?
A Because when I went into the store I saw him break a $50 bill.
THE COURT: I didn't hear that. I saw him?
BY THE WITNESS:
A Break a $50 bill.
THE COURT: Break a $50 bill.
THE WITNESS: Yes, ma'am.
THE COURT: All right.
BY MR. RICHARDS:
Q So then, then what happens?
A I asked him if he was lonely.
Q And he says?
A He said sure. And he asked me to follow him and we followed him — I followed him and when I got into the hallway —
Q How did you follow him?
A I walked.
Q How far or where did you go from Spunky's to where?
A About two blocks.
Q And to what location was that?
A That was his apartment building.
Q And then, I'm sorry, in your own words what happened after that?
A What happened after that was I had asked Fred to please follow in my car; him and my dog would wait in the car; and I told him to follow me in CT Page 13700-e the car.
Q Keep your voice up, okay?
A Okay. I told him to follow me in the car.
Q Right.
A And so when the — I got — I asked the guy, you know, how — what kind of money are we talking?
He said, Well, I don't want to talk about it on the streets, so
Q Where did that happen?
A On the way to the apartment it happened.
Q In between Spunky's and —
A Correct.
Q Okay.
A And so when we got in the hallway that's when we started discussing finances.
Q All right.
A And he was, like, you know, it's a little embarrassing. He was, like, well, I'll give you $10.
I said no. You'll give me more than $10. So I said forget it and I proceeded to leave and he put his arm out and he said, well, just wait a minute; can't we talk about it?
I said, Move your fucking arm. We can't talk about it, no.
Q All right.
A And I kicked the door open and I yelled, Fred. So Fred came running up and pushed the guy out of the way and we both left.
Pretty much I had gotten raped two weeks prior to that. Fred's a good friend of mine and, you know, quite honestly, I wasn't feeling too safe being by myself. So that's mainly why Fred was with me. And as far as I CT Page 13700-f know, Fred was right behind me. Fred pushed the guy down; that's all Fred did. And the only reason he did so was because the guy was not letting me go by. So it wasn't like he meant for the man to, you know, he just meant to get the man out of my way.
Q Was he — well, can you be more specific about what Mr. Schofield was doing to you at that time?
A Okay. Can I stand up?
THE COURT: Yes.
THE WITNESS: Okay.
BY THE WITNESS:
A Say this is the doorway and this is the outside and this is the inside. I'm inside, right?
Q All right.
A He put his hand up against the doorway, right, like this, you know?
Q The wall?
A Yes. And I said, you know, Get out of my way.
And he said, Well, wait. Can't we discuss this?
And I said, No. We can't discuss this. And with my foot I kicked the door open and I yelled out, Hey, Fred. And the door closed back up. Fred came coming in; he opened the door; he pushed the guy out of the way so I could get by; and we left.
Q Could you describe that hallway, just how wide it was?
A It's wide, about this wide. I'd say about this wide. (The witness indicated.)
Q This wide being?
A About this wide, I'd say. Maybe —
Q Is that approximately what? How many feet? CT Page 13700-g
A About 2-3 feet.
Q Two to three feet?
A Yeah.
Q And, again, what was the purpose of getting that money for this transaction? What were you going to do with the money?
A I was going to smoke Crack Cocaine with it.
Q Did you take anything from Mr. Schofield?
A No, sir; I did not.
Q Did Mr. Gallimore take anything from Mr. Schofield?
A No, sir; he did not.
MR. RICHARDS: No further questions, Your Honor.
THE COURT: Go ahead.
CROSS-EXAMINATION BY MR. SIBLEY:
Q Good afternoon, Ms. O'Connor. My name is Brian Sibley. I'm the prosecutor in this matter.
A Hello.
Q Ms. O'Connor, you pled guilty to conspiracy to commit a robbery in this case; is that true?
A Yes, sir; I did.
Q You did. Whose car was this?
A That was a friend of mine. His name — his name is Richard True. I was living with him at the time.
Q I'm sorry, I thought that you had just told Mr. Richards in your testimony that this was your car.
A Well, I had the car; it was in my possession. CT Page 13700-h
Q But you didn't own the car?
A No, sir.
Q Thank you. I don't have any further questions.
MR. RICHARDS: Let me just follow up.
REDIRECT EXAMINATION BY MR. RICHARDS:
Q You pled guilty to what, ma'am?
A I pled guilty to conspiracy because I didn't want to go to trial because I, quite honestly, I was a little nervous about going to trial.
Q And what did they offer you to avoid going to trial and plead guilty?
A They said that I would be getting out on a program, a suspended sentence.
Q And did you expect to leave today, in fact?
A Yes, I did.
Q Okay.
MR. RICHARDS: No further questions.
THE COURT: I'm sorry, when did you plead guilty?
THE WITNESS: I pled guilty on the 9th.
THE COURT: Of?
THE WITNESS: The 9th of — actually, I was supposed to plead guilty on the 9th. The judge that was there —
THE COURT: The 9th of what month?
THE WITNESS: Of this month, ma'am.
THE COURT: Of October? CT Page 13700-i
THE WITNESS: Yes, ma `am. I did plead guilty the — when I came the time before that. I can't even remember the date. I've been up I've taken this bus ride quite a few times, ma `am, and I was actually supposed to be released on the 9th and there was a problem; the judge wasn't here today; I was also not released so, I mean.
THE COURT: You pled in front —
Someone help me out. Who did she plead in front of?
MR. SIBLEY: I believe it was from in front of Judge Brunetti, Your Honor.
THE COURT: All right.
MR. SIBLEY: And there was a PSI that was prepared. Apparently, there was also supposed to be a sentencing for today. But with regards to Ms. O'Connor's matters, apparently there's a new warrant to be served in regards to something out of Hamden that predated the plea with regards to this matter.
THE COURT: All right. That's his best understanding in good faith of why you weren't sentenced with the presentence investigation.
THE WITNESS: Yes, ma `am.
THE COURT: So the option is still open.
THE WITNESS: Yes, ma'am.
THE COURT: I assume it was some type of cap situation, yes, with PSI or agreed; do you know?
MR. SIBLEY: I believe —
MR. RICHARDS: I don't know. I was just going to follow up on that and ask.
THE COURT: Do you know if there was an agreed or it was some type of cap situation? I mean, there wasn't a promise of a suspended sentence. There had to be a presentence investigation.
THE WITNESS: It was — it was a agreement, I believe, ma'am; yes, ma'am. CT Page 13700-j
THE COURT: With jail or treatment?
THE WITNESS: It was, uh, outpatient treatment, probation.
THE COURT: But you didn't get it the day you pled?
THE WITNESS: The judge didn't want to hear it. Apparently my attorney and the judge had worked — I don't know. Ma'am, you're asking the wrong person.
THE COURT: Well, it's your life. That's why I ask you.
THE WITNESS: Yeah. But these judges — I mean, these lawyers don't really let you know what's going on. I mean, honestly, I don't know what the problem was but I didn't go that day nor did I go today, ma `am.
THE COURT: All right. That's all, thank you.
THE WITNESS: Thank you, ma'am.
(The witness was excused.)
THE COURT: Anything further?
MR. RICHARDS: Defense rests, Your Honor.
THE COURT: Anything further from the state?
MR. SIBLEY: Nothing, Judge.
THE COURT: Does state wish to be heard? First on violation.
MR. SIBLEY: Judge, with regards to the violation I think that the — it's clear by the evidence that was presented through the probation officer, as well as the documents that were entered into evidence, that the defendant was, first of all, on probation. I don't think there's any disagreement with regards to that. And that defendant owes a period of 3 years in jail.
Through the testimony of specifically Mr. Schofield, I think that Mr. Schofield testified to the events on this particular date and that he was going to the store. He purchased a newspaper. As he returned to his apartment, he was accosted by two people, that being Ms. O'Connor and Mr. Gallimore. That the victim gave the police a description it later met. The police found these same people within a day. The victim indicated CT Page 13700-k that he identified these people. He was sure of the identification. There was no doubt in his mind as to who the people were. When he was brought there for the identification he indicated that they were wearing the same clothes; they had the same car; they had the same dog.
With respect to the statements that were taken, the statements that were taken by the officer almost every one of the facts is in line with what the victim's account is with the exception of Mr. Gallimore and Ms. O'Connor give a slightly different scenario, attempting to indicate that there was some sort of illegal transaction that was taking place between Ms. O'Connor and between Mr. Schofield. I think that in taking into consideration all the facts that came out during the testimony, I think that it's clear that there's a difference in what their renditions of the facts are.
Aside from even that is that Mr. Gallimore's own testimony on the stand the defendant implicated himself in at least three criminal violations: No. 1, he indicated that he had been using Crack Cocaine or Cocaine while he was on probation, in fact knew that he was on probation; he indicated that on this particular date he was under the influence and he was — I believe the testimony was that he was highly under the influence or something to that effect; but in any event, he indicated he was under the influence. He was also driving on this date; that's a second violation. Also indicated, Judge, through his testimony is that he was driving around with Ms. O'Connor, whom he knew to be a prostitute, and they were looking for Johns for Ms. O'Connor to — — to patronize or to engage in business with; that is tantamount to a promotion of prostitution.
Judge, with all those — just those three violations themselves, or those three activities themselves, it's clear that Mr. Gallimore was engaged in illegal activities while he was on probation and that a specific violation of probation is not to participate in illegal activities or commit crimes while on probation. I don't think there's any doubt to anyone that Mr. Gallimore did in fact violate his probation at least on the counts with regards to the things that he admitted to while on the stand, as well as to the engaging in the taking of the wallet from Mr. Schofield. For those reasons, I'd ask that the Court find Mr. Gallimore in violation of his probation.
THE COURT: Counsel?
MR. RICHARDS: Judge, first of all, I don't believe that the state's attorney can go outside the four corners of the warrant. Specifically —
CT Page 13700-l
THE COURT: Well, I need to see the warrant if we're going to argue the warrant.
(There was a pause in the proceedings.)
THE COURT: Go ahead.
MR. RICHARDS: Your Honor, Mr. Gallimore was there to protect Ms. O'Connor. The patrol officer had stated that this was not an area for prostitution; then the detective gets on there, obviously much more qualified and experienced, says that this was, unfortunately, an area known for prostitution. None of the officers even canvassed anybody in that building. Mr. Schofield himself said that when he is healthy that his voice can carry, and he can be much louder and could have yelled for help. There's no evidence that the bank card that was supposedly missing has ever been used. There's also no physical evidence on either one of the defendants that points to a robbery taking place with Mr. Schofield. There's none — no wallet or no bank card ever found on either one of those persons.
Mr. Schofield even came in the other — yesterday and said that he had been at the bar earlier in the day; however, he hadn't been drinking and hadn't drank in over a year; and he never said that any money was missing, which I thought was pretty confusing to me since this was supposedly a robbery. In his statement he says that he — in his statement he says yes, I saw them before at Spunky's, then later at my home. Then on his own testimony he says, Well, I never saw them at Spunky's. That never happened, but they were there at my house.
And guess where they find Ms. O'Connor and Mr. Gallimore? Back at Spunky's. That's where they actually get arrested a short time later after the alleged robbery. This is the very place that Ms. O'Connor and Mr. Gallimore both state that they propositioned Mr. Schofield. The detective said that the statements were very similar all the way through and even that both had stated that they — this was an operation where they were trying to promote Ms. O'Connor into prostitution with Mr. Schofield, and both of them had been continuously incarcerated ever since. And the only reason Ms. O'Connor, as she stated, she pled guilty to a robbery and is awaiting sentencing is because they're promising to let her out, although she hasn't been let out to this point.
I think it's pretty obviously that Ms. O'Connor and Mr. Gallimore were negotiating with Mr. Schofield for the price of sex. Something went wrong; Mr. Gallimore was outside; he ran in to aid her and pulled her out CT Page 13700-m of there. And so even if we believe Mr. Schofield and say that, yes, he was robbed and something was taken from him, Mr. Gallimore didn't have anything to do with that. Ms. O'Connor was in there with him previous, before Mr. Gallimore got there, and again she yelled for help. She said that they got into a tussle and then he comes to help her get out of there.
Your Honor, I just don't — I don't think that this is rising to a level of a violation of probation where Mr. Gallimore is just there merely trying to help her out, and I would ask you that you not find him in violation of probation.
THE COURT: This is a violation-of-probation hearing and obviously the issue is whether or not he's violated the terms and condition and you've raised the issue of whether or not he's put on fair notice of the conduct which violates the provision.
Obviously and you've — by your and his own admission, he did admit to a variety of — of circumstances all surrounding this same incident that did not meet up to the standards of probation. I don't have the history yet, but it was the benefit of a KDAC probation, which is an acronym for a special inpatient drug treatment program followed by a supervised probation. And so he had gotten that benefit of suspended sentence with — on a possession charge, with drug treatment.
At the time of this incident the Court has to weigh the testimony of the witnesses who have appeared in front of me and has to take into consideration with respect to the testimony the interests of the defendants as opposed to the victim, as well as in this instance defendant and his companion's acknowledgment that they were under the influence and high. What they may have been attempting, or thought they were doing, may not be in fact what was actually being done or perceived to be done.
Defendant is not — this is not an issue of finding a specific level of robbery in a specific degree of beyond a reasonable doubt; this is a finding of whether or not the conduct alleged violates probation; and that conduct alleged includes not only a robbery — and I forget the degree but the 1st or 2nd or conspiracy it also included — but we all treated it as a robbery, that any form of robbery would suffice. It also includes an assault on a person over 60, which was obvious and admitted, as well as a larceny in the 2nd, the theft from the person, and the testimony was that the wallet was taken.
How this incident started out, where the truth lies, is not necessarily CT Page 13700-n probative of how this incident ended or — but it is clear and convincing that by the time this incident had ended, that defendant had engaged in illegal conducts with respect to this victim and the interchange with the victim, at the very least an assaultive behavior. And in addition to the other conduct which he's already admitted to, the protection being provided to a prostitute which — and the purpose for being there, to obtain money, in this case by illegal means, in order to spend it on further drugs and to maintain or recover from the inability to maintain the high or the drug state that he was in.
The allegations are sufficient and the evidence is clear and convincing that defendant has violated the terms of his probation in the manner alleged by the state sufficient to support a finding of a violation of probation.
State wish to be heard on penalty? And I'd like his record, if you have it. I can sometimes read it faster than you can read it to me.
(There was a pause in the proceedings.)
THE COURT: And I'll state what I'm saying for the record; however, most recent conviction at or about the same time as the possession was a failure to appear, together with the possession. Those were for arrests of July '99, with the disposition of March of 2000 and includes the present probation. At or about the same time he disposed of other misdemeanor charges, drug offenses. Prior to that, in 1997 he did 2 1/2 years also on possession as a reduced charge; other charges were dropped. Then going back 15 years to a breach of peace and the carrying a weapon. There is prior history; most of it is narcotics. The — there is a robbery on his record, but it is over 10 years old. At that point in time, over 10 years ago, he does have three robberies on his record, all I don't have incident — all offenses occurring at or about the same time. Four, five, six, again that appears to be a string. We have July — they occur in 1990, actually appears to be a 2-week period, 3-week period, with a string of robberies. Subsequent to that it was mostly drugs. All right.
Counsel?
MR. SIBLEY: Judge, with respect to what the state would be asking in regards to a sentence, the state would be asking that the 3 years be imposed on a couple of grounds: (1) The defendant was given an opportunity through the court system with regards to probation to address narcotics' issues, substance abuse issues. It appeared that the services CT Page 13700-o were extended to the defendant; it appeared that he somewhat engaged in those; and he was actually being successful at some point. However, the defendant has a history of relapse as is in this case it appears that he has relapsed into the use of illegal substances and it also appears from — not only his record but as well as some of the other testimony that we heard here is that defendant is willing to resort to illegal activities in order to obtain these substances, not the least of which involves robberies.
So in order for this defendant, with the record that the Court just read into the record here with regards to the defendant having previous robberies, having had several narcotics' violations and then now we have a violation of probation for a narcotics' violation, again, it's the state's opinion that the defendant really has left the Court with little in the way of other opportunities for Mr. Gallimore other than perhaps to prevent him either from harming members of the community with regards to his activities to obtain these substances, as well as he's had opportunities to address issues and he's chosen not to. For those reasons, be asking that the full 3 years be imposed.
THE COURT: Counsel?
MR. RICHARDS: Judge, Mr. Gallimore, it's clear — and you just read through it, it's specifically a bunch of narcotics — related offenses. He's well into his thirties now, and it's disappointing that he's back here before the Court, I'm sure. We would be asking for a sentence of 18 months, Your Honor. I think that his involvement in this case was minimal. I still have trouble believing Mr. Schofield and I know that's not part of this case, but again I'd be asking for 18 months in light of what his narcotics' background. And his problems with drugs I think it could adequately be addressed with that 18-month sentence.
THE COURT: Obviously, the Court now takes the entire situation with the records. It is, I agree, unfortunate, when we take a person with a bad record and they come in front of us as a judge and ask for a program and in that moment when the court decides and decided with Mr. Gallimore perhaps because there were some time periods when he was out of jail that he was able to maintain himself — to give him one of the — we don't have perfect programs; we just have what we have to work with — and give him the benefit of a program which included a suspended sentence and inpatient care.
The number of people that have come and asked for those programs — and we heard your co-defendant do the same today, looking for the program. But you have to understand that if you're using that program to CT Page 13700-p the detriment of someone else or being given another chance, it has to be taken seriously and not as a get-out-of-jail card. There isn't a claim that you left the initial treatment; that's the easy part; it's the follow-up; and it's the preventing relapse that brings us to the point that we're at today and in that is the point in time when you disregarded the probation and the benefit and the leg up you'd been given to clean up and start over by going back into the lifestyle that puts you in a position of assisting a prostitute turn tricks so that you can do drugs, regardless or where or who — to whose advantage or disadvantage the — it was clear that the money was intended to be gotten by illegal means, that the intended victim here — six-thirty in the morning the pickings weren't very great and we pick on a 70-year-old man getting his paper, with cash, as acknowledged by the defendant. And when it couldn't be got one way, the allegation and the Court — is not to be disbelieved that his wallet was taken. Whether or not that was the original plan or intent I leave to a criminal court; nonetheless, it's clearly illegal and the assaultive behavior, which is also the promoting prostitution used to overcome resistance when the deal went sour, the fact that he has alleged his wallet was taken and would have no reason to have complained otherwise, the fact no one else did complain — the police weren't called because someone came upon this alleged deal gone wrong. The police were called because he called the police and consistent and at the time of the offense which, as you know, the Court found promoted his version of the events over the acknowledged version of the defendant and his companion, who also acknowledged either being high or close to being or severely under the influence or suffering from withdrawal.
This isn't what probation's about and this isn't what treatment's about and having had that opportunity that was given to you in good faith to have a program and participate in follow-up care, turn it into preying on the elderly on our city streets is deserving of the penalty that was suspended and, accordingly, the Court terminates probation and imposes a sentence of 3 years to serve.
Correction. I am going to vacate that for a moment. I realize under current case law it may not be required, but it is in my practice. I know I let counsel argue.
This is a sentencing decision: Mr. Gallimore, I will reconsider if you wish to — would you wish to address the Court?
MR. GALLIMORE: Yes, Your Honor.
THE COURT: I've made assumptions and I've listened to counsel but I CT Page 13700-q haven't heard from you. So you talked to me about the incident that date, but talk to me about treatment and probation.
MR. GALLIMORE: Thank you, Your Honor. I received a 45-day period program at CVH. People there agreed that it wasn't long enough for a person who had a long history of substance abuse. I successfully completed that program. During the time that I completed the program and was on probation, I was abiding by probation up to this period in point. As I saw it, he had nothing bad to say about me. I was still in positive status that they called positive status and doing a lot of mentoringship.
I did little odd jobs to keep a little money in my pocket prior to this incident, and up to that point I was also involved in schooling and it's called "The Leadership Project." And we was hoping that if everything went our way, I would be back in for this semester and stuff like that.
But, again, Your Honor, that program was only one program that I ever had in my life, only one. Where I don't think one was enough. I'm not here to ask or beg for a program. I know that's not going to happen. I'm just simply being honest. One program, 45 days to a person like me with a long period of history of for drugs dating back to over 10-12 years ago, 45 days completed in 30 days, and then kicked out and then kicked out and says, you know, follow up on this, follow up on — and I did and I did my best from what little treatment that I had inside the program and whatnot. And I think that by — by completing that treatment program, it says something; and by abiding by my probations up to this point incident, that said a lot.
I'm not really a bad person. It — I was affiliated at one point in time in my upbringing back in the nineties with a gang. I was living in the neighborhood housing project at that time here, in New Haven. A lot of that was due to peer pressure. I was the only child being raised. As you can see, I have a problem with my right eye; I'm actually blind; I had to go through a lot of childhood pressure being called names, not knowing how to fight, trying to fit in, to find friends and everything like that. I grew up where people would say I had a dysfunctional family, a single mom trying to raise four children on her own, me being the oldest and the only child for a period of time. I was real good in school; I was really good in school; I participated in little athletics' program and stuff like that.
But prior to up — to up to now, I know that I have completed basic computer program, completed the treatment program, kept a little part-time job, mentored at a homeless shelter program, worked there at the (inaudible) as their co-director, 900 Gavin Avenue; that's the New Haven CT Page 13700-r Homeless Resource Center; I organized some things with Respect Line, which is a Yale-based student organization working with the homeless; that's the reason why the tents are on the Green right now. I'm a part of that affiliation, and I'm — I know that I'm being sorely missed right now due to this incident and everything. And prior to this, I was also enrolled in a leadership project again, Your Honor, so I know — I know I'm not trying to ask for a program or anything like that; I'm just — just saying that it's not as bad as it all seems coming from my end. Thank you.
THE COURT: Let me see the record again, please. You are very well spoken and I will give this some further consideration.
May I see the record again, please?
(There was a pause in the proceedings.)
THE COURT: I've reviewed the record again. Unfortunately, in the old matters there were also — there was probation and there was probation revocation; there were drug programs back in the nineties; there clearly were drug programs in the other years; and the offenses and again the — the opportunity that you were given with the suspended sentence on the possession alone — and it was in accordance with what happened — presumably that was just a possession and that's why you got the suspended sentence and the probation despite the record, which included prior violations of probation. You got the opportunity, I agree it may take repeated steps, but it was an opportunity and all the programs that were there you disregarded with even the one-time binge or the — you certainly weren't of use to the people that you were trying to help or who were trying to help you when you're out turning assisting turning tricks to stay high. And that I realize is part of the addiction; but when that is spread and imposed on others, with your record some responsibility has to be imposed. And the Court looked to see in your prior record when you violated; there are sentences that were consistent, 2 1/2 years and 2 years being some of the most recent sentences. And, accordingly, the Court cannot see fit to reduce the sentence since penalty should be progressive and, accordingly, the Court will impose the 3 years. CT Page 13701